# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FRANK LEBEAU, JR. | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | CIVIL ACTION |
| GARY RODEN, Superintendent, | ) | NO. 09-10697-RGS |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

July 6, 2011

DEIN, U.S.M.J.

## I.  INTRODUCTION

Petitioner Frank LeBeau, Jr. ("LeBeau" or the "defendant") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2004 conviction for first degree murder on theories of deliberate premeditation and extreme atrocity or cruelty, and larceny.  See Commonwealth v. LeBeau, 451 Mass. 244, 884 N.E.2d 956 (2008).  By his petition, LeBeau contends that he is entitled to habeas relief because: (1) the trial court violated state and federal law by failing to suppress LeBeau's confession; (2) the trial court erroneously admitted evidence that police had obtained in violation of LeBeau's Fourth Amendment rights; (3) the Supreme Judicial Court ("SJC") erred by rejecting LeBeau's claim that his trial counsel's assistance had been ineffective in failing to move to suppress certain evidence; (4) the trial court erroneously admitted irrelevant

and highly prejudicial evidence; and (5) the SJC erred by failing to reduce the first degree murder verdict to manslaughter or second degree murder in accordance with SJC precedent.[1] Petitioner's Memorandum (Docket No. 23) ("Pet. Mem.").  For the reasons detailed herein, this court finds that the state courts' rulings on these issues were not contrary to or an unreasonable application of Supreme Court law.  Therefore, this court recommends to the District Judge to whom this case is assigned that the Petition for a Writ of Habeas Corpus be DENIED.

## II.  STATEMENT OF FACTS[2]

### Procedural History

LeBeau was indicted by a Berkshire County grand jury on September 20, 2002 for murder in the first degree, larceny under $250, and three counts of larceny over $250 in connection with the death of Robert Vincent by bludgeoning on August 17, 2002.  SA 5, 18, 89.  He filed a motion to suppress statements he had made to the Pittsfield police and the Massachusetts state police following his arrest, which was denied after a hearing on October 17, 2003.  SA 126, 88.  The hearing judge was the same judge who presided at

_____

[1]  LeBeau has also claimed that the trial court erred by denying LeBeau's motion for a required finding of not guilty on multiple larceny counts.  However, that issue is moot as the SJC vacated all but one of the larceny counts as duplicative, and will not be discussed further.  LeBeau also has filed a Supplemental Memorandum (Docket No. 26) in which he appears to assert that a judge who ruled on a motion for change of venue and the prosecutor were biased, and that he was prevented from taking the stand in his own defense by the judge.  These issues were not raised in the state court and have not been exhausted.  Therefore, they will not be discussed further herein.  See Josselyn v. Dennehy, 475 F.3d 1, 2 (1st Cir. 2007).

[2]  The Respondent has filed a Supplemental Answer (Docket No. 20) ("SA") containing the record below.

trial. LeBeau then filed a motion for reconsideration with a supporting memorandum, which was denied on March 5, 2004. <u>SA</u> 131, 142. His petition for interlocutory appeal was denied by the SJC on March 25, 2004. <u>SA</u> 10.

A jury trial commenced on September 22, 2004, with Agostini, J. presiding. <u>SA</u> 14. On October 8, 2004, the jury found LeBeau guilty of murder in the first degree under the theories of deliberate premeditation and extreme atrocity or cruelty, and guilty of all the counts of larceny. <u>SA</u> 16. He was sentenced the same day to a mandatory life sentence without the possibility of parole on the murder conviction, a consecutive sentence of three to five years on a larceny count, and concurrent term sentences on the remaining larceny counts. <u>SA</u> 16.

LeBeau appealed to the SJC. In a decision dated April 22, 2008, the SJC affirmed the murder conviction and one conviction for larceny over $250, but vacated the remaining larceny convictions and sentences as duplicative. <u>Commonwealth v. LeBeau</u>, 451 Mass. 244, 884 N.E.2d 956 (2008). This timely habeas petition followed.

## <u>The Underlying Crime</u>

The state trial and appellate courts' findings of fact are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). <u>See</u> <u>Gunter v. Maloney</u>, 291 F.3d 74, 76 (1st Cir. 2002); <u>Rashad v. Walsh</u>, 300 F.3d 27, 35 (1st Cir. 2002). The following is a summary of the facts the jury could have found. Additional facts can be found in the SJC's detailed decision.

The murder victim, Robert Vincent ("Vincent"), age 62, lived in a one-room apartment on Tyler Street in Pittsfield.  LeBeau, 451 Mass. at 245, 884 N.E.2d at 959. Vincent had been the store manager of Tyler Home Supply for years.  Id.  Each work day he followed the same routine: in the morning he would open the store for business on time and at the end of the day he would walk up the street to a local bar, the Tyler Café, to play Keno and drink a few beers before walking home.  Id. at 245, 884 N.E.2d at 959-60.

LeBeau had moved to Pittsfield from Great Barrington earlier that summer and had been a frequent patron at the Tyler Café since his arrival.  Id. at 246, 884 N.E.2d at 960. Prior to his arrest for Vincent's murder, he was living with his friend Beverly Besanceney in a two-bedroom apartment.  Id.  At the time of the murder, LeBeau was not working and needed money.  Id.

On Friday, August 16, 2002, Vincent followed his normal pattern.  Id.  After work, he went to the Tyler Café and played Keno.  Id.  Playing the same numbers he always played, Vincent won $473 that afternoon.  Id.  With his winnings, he purchased a round of drinks for everyone in the bar and gave the bartender a ten dollar tip and the Keno operator a forty-eight dollar tip.  Id.  Vincent left the bar to go home at about 4:30 p.m. Id.  He bought three more Keno tickets before leaving.  Id.  The bar's customers continued to discuss Vincent's win for hours after he left.  Id.

LeBeau arrived at the Tyler Café a few hours after Vincent had left.  Id.  Apart from a period of thirty minutes between 9:00 p.m. and 11:00 p.m., LeBeau never left the

bar that night until it closed.  Id.  During the course of the evening he drank several rum and coke cocktails.  Id.  Video from the bar shows him there with one other customer between 1:00 a.m. and 2:45 a.m. on August 17, 2002, and helping the female bartender clean off tables at closing time.  Id.

Sometime after LeBeau left the bar, an intruder entered Vincent's apartment and beat him to death with a foam-covered steel exercise bar while Vincent was sleeping on the couch.  Id.  The murderer took three Keno playing cards, two rings, and about $400 in cash and fled the scene.  Id.

When Vincent did not open Tyler Home Supply as usual that morning, two of his co-workers went to his apartment, and when there was no response to their knock, called police and entered the apartment through the back door, which had a cardboard square taped over a missing window pane.  Id. at 246-47, 884 N.E.2d at 960.  There they discovered Vincent's body wrapped in a comforter on the floor.  Id. at 247, 884 N.E.2d at 960.  The police arrived shortly thereafter.  Id.

**Interview and Arrest**

The Pittsfield police spent the days following the discovery of Vincent's body attempting to interview everyone who had been at the bar on the night of August 16, 2002.  Id.  Police learned that "the defendant had returned to Besanceney's apartment in the early hours of Saturday morning, shirtless and sockless; had acted strangely throughout the day; and had left Pittsfield, with most of his belongings, on Saturday

evening" after having obtained a lift from a friend, Mark Shar, who drove him to the

home of another friend, Kevin Bradley, in Brimfield. <u>Id.</u> at 247-48, 884 N.E.2d at 961.

On the night of Tuesday, August 20, 2002, Officer Glen Decker and Detective

Thomas Bowler of the Pittsfield police, along with Lieutenant Richard M. Smith of the

State police went to Brimfield to interview LeBeau. <u>Id.</u> at 248, 884 N.E.2d at 961. The

officers encountered LeBeau, who was on the roadside holding a beer and talking on a

cellphone, at about 11:20 p.m <u>Id.</u> The officers were in plain clothes and an unmarked

police cruiser. <u>Id.</u> Their badges were visible, and they were armed. <u>Id.</u> As the SJC

summarized the motion judge's findings following an evidentiary hearing on LeBeau's

motion to suppress (which coincided with the testimony at trial):

> [T]he officers stepped out of their vehicle and introduced them-
> selves. They explained that they were investigating a murder that
> had occurred in Pittsfield and were interviewing everyone who had
> been in the Tyler Café on the previous Friday. They asked the
> defendant if he would go with them to the Sturbridge State police
> barracks to be interviewed. The defendant agreed to be interviewed,
> but asked whether the interview had to be done that night. Lieuten-
> ant Smith responded that this was a serious case, they had traveled a
> significant distance, and they would like to get the statement that
> evening. The defendant voluntarily agreed to go with them, and
> walked inside the house to tell his friend, Kevin Bradley, that he
> would be going to the police barracks. Because the defendant was
> holding a beer can, Lieutenant Smith inquired as to how much the
> defendant had had to drink that evening. Although the defendant
> stated that he had consumed from five to eight beers since 5 p.m.,
> there was no evidence that the defendant was affected by his
> consumption of alcohol. The officers did not notice any odor of
> alcohol on the defendant. The defendant appeared sober, spoke
> clearly, and had no difficulty understanding the purpose of the visit.
> Although it was quite dark, the defendant easily navigated the

narrow forty-foot gravel path that sloped down to Bradley's house, including four steps, with little or no lighting.

The defendant entered the house and disappeared from the officers' view. The officers decided to follow. They knocked on the door, and Bradley invited them in. Lieutenant Smith explained to Bradley that the defendant was not under arrest, but had voluntarily agreed to go with them to the barracks to be interviewed. Lieutenant Smith then summoned a cruiser to transport the defendant, Detective Decker, and Officer Bowler to the Sturbridge barracks. Lieutenant Smith returned inside and took Bradley's statement. By counting the beer cans left in the refrigerator, Bradley determined that the defendant had consumed only four beers that evening.* Bradley indicated that a wallet lying on the kitchen table belonged to the defendant.

> \* The motion judge made an express finding that this was a more credible account of the number of beers consumed by the defendant during the evening of August 20, 2002.

The Sturbridge barracks was a little less than five miles from Bradley's house. At the barracks (after stopping once on the way to purchase coffee for the defendant), the officers and the defendant proceeded to a conference room on the second floor. The defendant again was informed that he was not under arrest and was free to leave at any time. The defendant was told that the police were interviewing everyone who had been at the bar on Friday evening, and that someone had seen him there that night. The defendant retorted that it would be "my word versus his word."

The defendant was calm, cooperative, and confident when he provided the officers with his first written statement.** The defendant had a specific memory of his activities during the day of the murder and provided the police with a great deal of information. He understood the questions, was quick to answer, expressed himself clearly, and even assisted the officers in the spelling of names and words.

> \*\* The interviewing process began at 11:52 p.m. and concluded at 2:45 a.m.

On completing his first statement, he asked to have a cigarette. Detective Decker explained to the defendant that it was a smoke-free building, and the defendant responded, "I'm not under arrest so I can just go outside." Detective Decker agreed and stated, "Absolutely, you can leave any time you want."

The defendant went outside the building, unaccompanied, to smoke on four different occasions during that time. The defendant was not restrained in any way, nor was he followed or observed during the times that he was outside the conference room. Officer Bowler and Detective Decker were polite and accommodating at all times. They made it clear to the defendant that he was not under arrest, he was being asked to answer certain questions voluntarily, and he could leave at anytime. The motion judge determined, beyond a reasonable doubt, that when the defendant voluntarily made his first statement, he was not in custody and no Miranda warnings were necessary.

After a break, the officers asked the defendant whether they could have his pants and boots for laboratory testing. The defendant demurred, stating that he had no other pants or boots to wear to work. A compromise was agreed to in which the officers would take photographs of the defendant's pants and boots and ink impression of the soles of the boots. The defendant also was asked for permission to search his personal belongings at Bradley's house, including his wallet. He initially agreed, but then told the officers that there was a small amount of marijuana in his things at Bradley's house. He expressed concern that he might be arrested for the marijuana and was worried as well that Bradley would be angry with the defendant, who had given Bradley his word that he was drug free. The officers assured the defendant that no arrest would be made for possession of marijuana and that every effort would be made to conceal the marijuana from Bradley. The defendant agreed and signed a "consent to search" form that had been provided by the State police.***

> *** The record shows that the defendant signed the consent to search form at 3:50 A.M.

The officers then made ink impressions of the defendant's boots. The defendant was asked, and agreed, to provide a DNA sample.

Detective Decker then photographed the defendant's body, with and without his shirt. In one photograph the defendant appeared to be laughing. The officers thanked the defendant for his cooperation, and the defendant stated that he was willing to do whatever he had to do to clear his name.

At approximately 4:40 a.m., a copy of the defendant's signed consent to search form in hand, Lieutenant Smith initiated a search of the defendant's belongings at Bradley's home. In the defendant's wallet, among other things, Lieutenant Smith found three Keno tickets. The significance of the Keno tickets was immediately apparent to Lieutenant Smith. Information on their discovery was relayed back to officers at the Pittsfield police station, who advised Lieutenant Smith to stop the search because an application for a search warrant for Bradley's house was being prepared.

Shortly before 5 a.m., Detective Decker thanked the defendant for his cooperation and informed him there was nothing more he needed to do. Detective Decker then told the defendant that he wanted to share with him some additional information, but, first, he needed to advise the defendant of his Miranda rights. Detective Decker read the rights, one by one, from a form obtained earlier that evening from the Pittsfield police department, asked the defendant whether he understood each right, and had the defendant read the rights himself. The defendant then signed the bottom of the form, indicating that he had read and understood his rights. The defendant also signed a waiver of those rights. The warning form and waiver form were signed at 4:55 a.m. and 4:56 a.m., respectively.

The tone of the conversation changed somewhat and became "slightly more ominous." The defendant (who had previously been confident to the point of "cockiness") appeared to listen more carefully and respond to the officers' questions more deliberately. The defendant was told that the police had him on videotape at the bar on Friday night and that his friends in Pittsfield had expressed certain concerns with his appearance and actions taken on early Saturday morning. When Officer Bowler confronted the defendant with the stolen Keno tickets, the defendant became extremely quiet. He stared at the tickets, and, after a few minutes, said, "I'm fucked." After another period of silence, the defendant said, "You guys must really hate me." There followed more periods of silence, broken by

intermittent comments made by the defendant, and responses to the defendant's comments made by the officers.****  Officer Bowler told the defendant that he saw a little devil on one of his shoulders, and a little angel on the other, and asked the defendant which one he would like him "to knock off."  The defendant replied, "The one in the middle."  At this point, the police considered the defendant to be in custody and believed they had probable cause for his arrest.

> **** Detective Decker assured the defendant that they did not hate him, but said they would think more of him if he had a conscience.  He told the defendant that this was his chance to tell what happened and how he felt.  The defendant asked what would it matter, because he would be spending the rest of his life in prison.  He asked the officers whether it would be State or Federal prison.  Officer Bowler responded "State."  The defendant stated that he had a big decision to make.  The officers agreed and allowed the defendant time to think.  The defendant made other statements of similar ilk, to which the officers responded in calm tones.  Detective Decker then asked the defendant whether he wished the incident never had happened.  The defendant nodded.  Detective Decker asked the defendant whether he felt bad for what he had done to the victim, and the defendant nodded.  He asked the defendant if he were remorseful.  Again, the defendant nodded.  The defendant suggested that maybe he "should just gamble, like O.J. Simpson did."  Detective Decker told the defendant that he was not O.J. Simpson and that O.J. Simpson did not have three Keno tickets belonging to the victim in his wallet.  The defendant agreed.

At approximately 6:30 a.m., Lieutenant Smith returned to the Sturbridge barracks after completing a search of Bradley's home.  Lieutenant Smith discussed the defendant's situation with Officer Bowler and was told that "he hadn't got there yet," meaning (the judge understood) that the defendant had not yet made a confession.  Lieutenant Smith entered the conference room and sat down across from the defendant.  He told the defendant that his friends, Shar and Bradley, could not believe he was involved with such a brutal incident and that it was his chance to tell his side of the story.*****  Lieutenant Smith said to the defendant, "Look at me ... did you kill that man?"  The defendant indicated that he would speak with

Officer Bowler and Detective Decker. Lieutenant Smith left the room. The defendant began to cry.

> ***** Lieutenant Smith told the defendant that everyone makes mistakes, and that this was the time to provide "a big piece of the puzzle." He told the defendant that the physical evidence at the crime scene indicated that the victim's death was a violent and brutal crime" committed by "some monster" and that the defendant could tell "what if anything [had] happened ... inside the apartment."

At 7:14 a.m., Officer Bowler and Detective Decker began to take the defendant's second statement. The defendant recounted details of the events that, according to the defendant, led to the victim's death [, including that defendant had come to the victim's home and hit the victim]. [Footnote omitted.] After reviewing what had been written, the defendant indicated his desire to add an apology to the victim's family. The defendant signed the completed statement at 9:15 a.m.

At 9:35 a.m., Lieutenant Smith formally arrested the defendant for the murder of Robert Vincent. The defendant was advised of what would happen next, including his transportation to the Pittsfield police station, his booking, and his arraignment. At that time Lieutenant Smith also advised the defendant of his statutory right to a telephone call, pursuant to G.L. c. 276, § 33A. Although the defendant first appeared not to wish to exercise this right, with Detective Decker's encouragement, he made contact with his two friends, Shar and Bradley. [Footnote omitted.] While in the process of being transported to Pittsfield, the defendant thanked both Officer Bowler and Detective Decker twice.

Id. at 249-54, 884 N.E.2d at 962-65.

The two statements given by the defendant differed dramatically. In the first statement, LeBeau "denied knowing the victim, denied being at the Tyler Café on Friday evening, and denied ever having been in the victim's apartment." Id. at 248, 884 N.E.2d at 961. "In the second, the defendant confessed to the killing and apologized to the

victim's family." Id. In his ruling on the motion to suppress, the motion judge found "beyond a reasonable doubt, that when LeBeau voluntarily made [his] first statement, he was not in custody, was not subject to interrogation, and no Miranda warnings were necessary." SA 105. He further found that the Miranda warnings were given once the police found the Keno tickets in LeBeau's wallet, and "prior to revealing information that they had previously obtained that contradicted the defendant's version of events." Id. Thus, the motion judge found "beyond a reasonable doubt, that the Miranda warnings were properly given to the defendant and he understood the warnings. [He further found], beyond a reasonable doubt, that LeBeau had knowingly, intelligently and voluntarily waived his Miranda rights." SA 105-06. Based on the testimony and review of the evidence, the motion judge concluded that LeBeau "was sober and was not suffering from any sleep deprivation or any other physical or mental problems, and thus, was able to give voluntary statements to the police." SA 108. The SJC concluded that these findings were amply supported by the record and that the motion to suppress was appropriately denied. LeBeau, 451 Mass. at 254-56, 884 N.E.2d at 965-67.

## Evidence at Trial

In his habeas petition, LeBeau challenges the trial judge's decision to admit certain evidence in addition to his statements to police discussed above. Specifically, although he did not file a motion to suppress before trial, at trial his counsel objected to the admission of the Keno tickets that police found in LeBeau's wallet on the grounds that the search was illegal. SA 748. In addition, LeBeau objected to portions of testimonial evidence on

the grounds that it was irrelevant and highly prejudicial: he now contends that its admission undermined the integrity of the verdict.  See LeBeau, 451 Mass. at 260, 884 N.E.2d at 969.  In particular, Lebeau objected to the bartender's testimony that, on the night of Vincent's murder, LeBeau "flirted with her and lifted up his shirt to show off his physique."  Id.  In addition, the mother of LeBeau's child was permitted to testify that, at the time of the murder, the defendant had been ordered to pay her $25,000 for child support.  Id.  Further, a "former friend testified that, in early August, 2002, the defendant had stolen a one hundred dollar bill from her after spending the night at her apartment" and that, after LeBeau had been warned that he should repay the money by August 26 to avoid criminal charges, LeBeau had sent the friend a money order for one hundred dollars on August 20.  Id., 884 N.E.2d at 970 (footnote omitted).  The trial judge instructed the jury that "the defendant was not charged with failing to pay child support or with stealing the one hundred dollar bill; that they were not to consider either issue in their delibera- tions; and that the evidence was relevant only to the defendant's state of mind."  Id. at 261, 884 N.E.2d at 970.  The SJC ruled that the trial judge's rulings "were not in error." Id.

The trial judge also admitted several pieces of arguably inflammatory evidence to which LeBeau did not object but which, on appeal, LeBeau claimed had been improperly admitted.  Id. at n.18.  This testimony was "racially and sexually charged comments in the defendant's first statement" to the police, SA 758-59, 764, testimony from the bartender at the Tyler Café that on the night of the murder she saw LeBeau standing near her truck and

directly afterward discovered that someone had punctured her tire with scissors, SA 660-62, and LeBeau's testimony that he possessed a small amount of marijuana. SA 745-46, 770-71. The SJC ruled in a footnote that "[a]lthough certain portions may have been unnecessarily inflammatory, . . . in light of the compelling nature of the Commonwealth's admissible evidence, any error in the admission of the testimony could not have created a substantial likelihood of a miscarriage of justice." LeBeau, 451 Mass. at 261 n.18, 884 N.E.2d at 970 n.18. LeBeau now argues that he is entitled to habeas relief because admission of the above evidence was irrelevant and highly prejudicial.

Additional facts will be provided below where appropriate.

## III.  ANALYSIS

### A.  Standard of Review

The standard of review to be applied to LeBeau's habeas corpus petition is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The standard allows a federal court to grant a writ of habeas corpus only if the underlying state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

When deciding whether to grant relief under the first prong of the statute, the habeas court performs two distinct analyses, one for the "contrary to" clause and one for

the "unreasonable application" clause.  Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002).  A writ of habeas corpus is only appropriate "under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts."  Id.  By contrast, relief is proper "under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [the Supreme Court] decisions but unreasonably applies it to the facts of the particular case."  Id.  An unreasonable application is more than just error, entailing "some increment of incorrectness beyond error[.]"  McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc) (internal quotation and citation omitted).  Accord Bell, 535 U.S. at 694, 122 S. Ct. at 1850.

With respect to factual findings, "the AEDPA sets out a separate and exacting standard applicable to review of a state court's factual findings."  Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007) (citing, inter alia, 28 U.S.C. § 2254(e)(1)).  Thus, there is a presumption that factual findings by the state court are correct, and the habeas court must defer to such findings.  Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001).  "[A] habeas petitioner can rebut this presumption by adducing 'clear and convincing evidence'" that convinces the habeas court "that the underlying state court's adjudication 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,' [28 U.S.C.] § 2254(d)(2)."  Id.  See also

Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007) (petitioner bears the burden of overcoming the presumption of correctness by providing 'clear and convincing evidence' of the error).

Finally, a writ of habeas corpus does not lie for errors of state law. "Federal habeas is not an ordinary error-correcting writ." Nadworny v. Fair, 872 F.2d 1093, 1096 (1st Cir. 1989). Rather, it "exists to rescue those in custody from the failure to apply federal rights, correctly or at all." Id. Thus, habeas relief is only available if a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States[,]" it "does not lie for errors of state law." Swarthout v. Cooke, 131 S. Ct. 859, 861, 2011 WL 197627, at *2 (S. Ct. Jan. 24, 2011) (internal quotations and citations omitted).

Applying these principles to the instant case compels the conclusion that the petition for a writ of habeas corpus should be denied.

**B.    Denial of LeBeau's Motion to Suppress His Confession**

LeBeau contends that he is entitled to habeas relief because the SJC erred in affirming the trial court's decision to admit LeBeau's second confession. First, he claims that the police obtained the confession without advising him of his right to a telephone call within an hour of his arrival at the police station, as allegedly required by Mass. Gen. Laws ch. 276, § 33A (2004).[3] Pet. Mem. at 14-20. Second, he argues that his waiver of

---

[3]  Mass. Gen. Laws ch. 276, § 33A provides as follows:

> The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney.  Any

his Miranda rights was not knowing, intelligent, or voluntary as required by Supreme Court precedent.  Id. at 20-27.  For the reasons detailed herein, this court finds that LeBeau has failed to establish a basis for habeas relief.

### 1.    Deprivation of Right to Use the Telephone

Mass. Gen. Laws ch. 276, § 33A "requires that a person under arrest be advised of [the right to use a telephone] at the time he arrives at the police station, and that he be afforded an opportunity to make a telephone call within one hour thereafter."  LeBeau, 451 Mass. at 256-57, 884 N.E.2d at 967.  In LeBeau's case, the SJC ruled that "[w]e need not decide whether the statute requires that an individual, not in custody, who has arrived at a police station must be advised of his telephone rights within one hour of the time police have probable cause to arrest (as the defendant appears to argue), or merely within one hour of the time his formal arrest takes place (as the Commonwealth maintains), because we conclude that the statute was complied with" under the circumstances presented, since the defendant was advised of his Miranda rights as soon as the inquiry "began sharply to focus on inconsistencies in the defendant's story," and he was advised of his statutory right to make a telephone call "within minutes of his formal arrest."  Id. at 257, 884 N.E.2d at 967.  Even assuming, arguendo, that this ruling was in error, LeBeau has not raised a cognizable habeas claim.  "Errors based on violations of state law are not

---

such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter.

within the reach of federal habeas petitions unless there is a federal constitutional claim raised." Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006) (citation omitted).  Here, LeBeau has alleged only a violation of state law.  This court cannot grant habeas relief based on the alleged violation of Mass. Gen. Laws ch. 276, § 33A.

### 2. Confession and Waiver of Miranda Rights

LeBeau challenges the state courts' denial of his motion to suppress his second statement on the grounds that it violated his Fifth Amendment right against self-incrimination.  Specifically, LeBeau argues that his waiver of his Miranda rights was not knowing and intelligent and his statement was not voluntary.  For the reasons detailed below, this claim must fail as LeBeau cannot establish that the state courts' determination of facts was unreasonable, or that the decision was based on an unreasonable application of clearly established Supreme Court law.

### The State Courts' Determinations of Fact

As an initial matter, LeBeau contends that "several of the motion judge's subsidiary factual findings are clearly erroneous." Pet. Mem. at 24.  These are the findings that he was not suffering from sleep deprivation, that the police did not engage in "trickery," that the interview was never adversarial, and that LeBeau was not "intimidated, frightened and panic-stricken." Id. at 24-26.  In federal habeas proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1). This presumption applies to findings of both the state trial and appellate courts, see Norton v. Spencer, 351 F.3d 1, 6 (1st Cir. 2003), and a habeas petitioner must present clear and

convincing evidence to overcome this presumption.  Teti, 507 F.3d at 58.  Relying on the same evidence that the court has already considered and providing an alternative interpretation is not sufficient to overcome the presumption.  Id. at 59 ("Describing how different parties stated different versions of events does not constitute the needed showing of clear and convincing evidence; rather, the state trial judge's implicit credibility determinations . . . are exactly the type of factual determinations to which we defer, at least short of any indication of serious error."); Desrosier v. Bissonnette, 502 F.3d 38, 43 (1st Cir. 2007) (concluding that "[i]t is not enough for [petitioner] simply to argue for the contrary inference" on habeas review).  LeBeau has failed to meet his burden.

LeBeau has not provided any new evidence or otherwise identified any facts which would cause this court to question the reasonableness of the state courts' findings.  The motion judge reviewed the evidence in detail before reaching his findings of fact and ultimate conclusion that the waiver of LeBeau's Miranda rights was knowing and intelligent and that his statement was voluntary.  See, e.g., SA 102-110.  He heard testimonial evidence from a number of police officers and one civilian, and also had LeBeau's affidavit.  SA 88-89, 129-30.  The fact that different findings could have been made, or that the motion judge could have found different evidence to be credible, is simply not enough to overcome the inference of reasonableness.

The absence of a substantive challenge by LeBeau is sufficient to end the inquiry as to whether the motion judge's findings of fact were clearly erroneous.  In any event, a detailed analysis of the challenged findings would result in the same conclusion that the

facts are supported by the evidence.  Thus, the motion judge's finding that LeBeau was
not impaired because of lack of sleep is amply supported by the record.  In addition to the
officers' testimony, photographs of LeBeau taken at about 4:30 in the morning were
reviewed by the judge, and showed an individual who did "not appear in any way tired or
intoxicated." <u>SA</u> 108.  LeBeau's statements to the police were coherent and responsive.
<u>SA</u> 108-09.  Although LeBeau was comfortable enough to ask for cigarette breaks and to
use the bathroom, he never asked to stop the questioning due to fatigue (or any other
reason).  <u>See</u> <u>SA</u> 94-95, 98-99.  The motion judge expressly considered the possibility that
fatigue impaired the voluntariness of LeBeau's statement, but concluded that there was
"no direct evidence that the defendant was fatigued, particularly to the point that his
admissions were involuntary.  Some weariness, by all the participants, may be assumed
given the time spent at the barracks; however, all the evidence indicates that LeBeau's
involvement was the product of a rational intellect and free will." <u>SA</u> 109.  The record
does not support LeBeau's contention that the finding that he was not impaired due to lack
of sleep was unreasonable.  <u>See</u> <u>LeBeau</u>, 451 Mass. at 255 n.12, 884 N.E.2d at 966 n.12.

    LeBeau also challenges the motion judge's finding that "[a]t no time was the
interview adversarial, nor were there any threats, harassment, or trickery.  The defendant
was responsive to all questions.  He did not appear to be intimidated, frightened or panic-
stricken." <u>SA</u> 107.  While LeBeau points to a few isolated moments during the entire
interrogation when he may have been uncomfortable, he has not set forth any evidence,
much less clear and convincing evidence, refuting the motion judge's findings of fact.  The

defendant has failed to overcome the presumption of correctness with respect to these findings as well.

In support of his claim of "trickery," LeBeau argues that "the officers [sic] tactic of getting Petitioner to give a lengthy statement which they did not challenge and then obtaining a Miranda waiver before confronting him with contradictory evidence was, at the very least, deceptive." Pet. Mem. at 25. As further evidence of this "trickery" LeBeau cites to Lt. Smith's "emotional plea . . . urging him to confess." Id. As LeBeau describes the events:

> [Lt. Smith] asserted that the evidence indicated that "this was a violent and brutal crime committed by a monster" and that he should take this opportunity to tell his side of the story. After this speech, he bluntly put it to Petitioner: "Frank, look at me. Did you kill that man?" In response, Petitioner finally cracked – two hours after he had received the Miranda warnings, about seven hours after the police had begun interrogating him and 24 hours after he had last slept. He began to cry, and agreed to make a second statement to Officers Decker and Bowler.

Id.

These facts, as alleged by the defendant, do not contradict the finding that the police officers did not engage in "trickery." There is no obligation that the police reveal all their evidence before obtaining a confession, and "it would be very hard to treat as *coercion* a false assurance to a suspect" that the case against him was weaker than it was. See United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998) (ruling that "trickery is not automatically coercion" and finding that "a false assurance to a suspect that he was not in danger of prosecution" was not coercion). Moreover, "an officer may suggest that it

would be 'better' for a suspect to tell the truth," so long as he does not give "an assurance, express or implied, that a statement will aid the defense or result in a lesser sentence." Commonwealth v. Souza, 428 Mass. 478, 481, 702 N.E.2d 1167, 1170 (1998) (internal quotations omitted). In sum, the motion judge's factual finding that there was no trickery was not clearly erroneous.[4]

LeBeau also challenges the finding that "[a]t no time was the interview adversarial" because "Lt. Smith clearly took an adversarial tone when he asserted that the crime was committed by a 'monster' and urged Petitioner to confess." SA 107; Pet. Mem. at 26. However, LeBeau also describes this conversation as being an "emotional plea." Pet. Mem. at 25. More significantly, there is no evidence, and LeBeau does not argue, that he was browbeaten into confessing, or that the police improperly berated him and thereby caused him to confess. See U.S. v. Santos, 131 F.3d 16, 18-19 (1st Cir. 1997) (law enforcement agent's yelling at the suspect "once or twice" and calling him a liar did not amount to coercion to render the suspect's statement involuntary). Moreover, the motion judge did recognize that the "tone of the conversation changed somewhat" after LeBeau was given his Miranda warnings, SA 98, but nevertheless concluded that, in general, the

_____

[4] LeBeau is not even claiming that the police's conduct rose to the level of lying to him, which – while perhaps more objectionable than the conduct at issue here – is not even enough in and of itself to constitute improper coercion. See United States v. Velasquez, 885 F.2d 1076, (3d Cir. 1989) ("lies told by the police do not necessarily make a confession involuntary; rather, this is simply one factor to consider out of the totality of the circumstances") (citing Frazier v. Cupp, 394 U.S. 731, 739, 89 S. Ct. 1420, 1425, 22 L. Ed. 2d 684 (1969) (fact that police misrepresented that co-conspirator had confessed "is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.")).

interview was not adversarial. LeBeau has not met his burden of establishing that the motion judge's finding that the interview was not adversarial was clearly erroneous.

Finally, LeBeau challenges the finding that he was not "intimidated, frightened and panic stricken" on the grounds that he became "intimidated, frightened and panic-stricken" after Lt. Smith's emotional plea asking if he committed the murder. Pet. Mem. at 26. Perhaps it was the gravity of the situation hitting home that finally caused the defendant concern. Since, however, there was nothing improper about the police suggesting that LeBeau tell his side of the story or asking LeBeau if he committed the crime, and even LeBeau does not suggest that he was "intimidated, frightened and panic stricken" in the hours leading to his confession, the motion judge's finding was not clearly erroneous. As detailed below, these findings support the conclusion that LeBeau's waiver of his Miranda rights was knowing and intelligent and that his statement was voluntary.

### The State Court's Decision Was Not An Unreasonable Application of Clearly Established Supreme Court Law

A defendant may waive his Miranda rights provided that the waiver is made "voluntarily, knowingly and intelligently." Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 1140-41, 89 L. Ed. 2d 410 (1986) (quotation omitted).

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced

choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Id. at 421, 106 S. Ct. at 1141 (internal quotations and citations omitted).  Both the motion judge and the SJC applied these standards when considering whether "the Commonwealth has proved, by a totality of the circumstances, that the defendant made a voluntary, knowing, and intelligent waiver of his rights, and that his statements were otherwise voluntary."  LeBeau, 451 Mass. at 254-55, 884 N.E.2d at 966, and cases cited.  Therefore, the inquiry is whether the SJC's decision was an unreasonable application of clearly established Supreme Court law.  It was not.

As the SJC found:

> The judge found beyond a reasonable doubt that the [Miranda] warnings were properly given to the defendant and that the defendant understood them.  The judge further found, beyond a reasonable doubt, that the defendant had knowingly, intelligently, and voluntarily waived his Miranda rights.  We reject the defendant's contentions that the judge erred in concluding that the Commonwealth sustained its burden of proving that the defendant's waiver was voluntary.  The judge fully explained the basis for his conclusion and the conclusion is supported by the testimony at the hearing.

> ... The judge found, beyond a reasonable doubt, that the defendant was sober and was not suffering from sleep deprivation or any other physical or mental problems, and thus was able to give voluntary statements to the police.  The judge further found that the defendant's overt cooperation with the police was, in essence, "an offensive weapon to ensure that he would not be viewed as a suspect, or as he often stated, 'to clear his name.'"  The judge determined that the defendant "knew precisely what he was doing when he made the challenged statements, and under the totality of the circumstances of the case, there is no evidence that any of the defendant's statements to the police were involuntary."  The judge properly concluded, beyond a reasonable doubt, that the defendant made his statement

-24-

voluntarily after an knowing and intelligent waiver of his Miranda rights.*

> \* We add that unchallenged testimony at trial supports a conclusion that, during the entire time that the defendant was in the Sturbridge barracks, he never complained, never brought up the topic of an attorney, and never indicated that he wanted to leave. His only requests – for cigarettes, use of the bathroom, and for water– were granted.  Moreover, as has been mentioned above, the defendant repeatedly stated to police that he would do whatever he needed to do to clear his name.  Lieutenant Smith's statement that the murder appeared to be "a violent and brutal crime committed by some monster" and that the defendant should "tell his side of the story" cannot fairly be characterized as coercion that would require suppression.

LeBeau, 451 Mass. at 255-56 & n.13, 884 N.E.2d 966-97 & n.13 (additional footnote and citations omitted).

"[A] defendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination."  United States v. Burson, 531 F.3d 1254, 1258 (1st Cir. 2008).  Where, as here, the defendant "was both physically and mentally in command of himself at the time of his arrest and throughout the police station interview," was not confused by the questions, and, despite some use of alcohol hours earlier and fatigue, was not "incoherent, intoxicated, or otherwise substantially impaired," the waiver of Miranda rights was properly upheld.  Id. at 1259.

Similarly, the evidence supports the conclusion that LeBeau's statement was voluntary.  As the First Circuit has recently explained, "[i]n evaluating whether a defendant's statements were voluntary, we must use the standard set forth in Colorado v. Connelly, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)."  United States v.

Boskic, 545 F.3d 69, 78 (1st Cir. 2008). Consequently, "only confessions procured by coercive official tactics should be excluded as involuntary." Id. (quoting United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998)). "Coercion sufficient to render statements inadmissible is not limited to brutality. Psychological duress, threats, unduly prolonged interrogation and many other circumstances, singly or in combination, may suffice." United States v. Jackson, 608 F.3d 100, 102-03 (1st Cir. 2010). But where, as here, there was "no evidence of threats of violence or serious retaliation by the officers" and while the interrogation was lengthy, as detailed above it was basically "conversational," there is no basis for rendering the statement inadmissible. See id. at 103. See also United States v. Verdugo, 617 F.3d 565, 575-76 (1st Cir. 2010), and cases cited. In sum,"[c]areful perscrutation of the record fails to disclose any extrinsic factors introduced by the [police] that could have distorted the defendant's judgment about whether to speak freely to them. Thus, the challenged statements can fairly be considered voluntary." United States v. Hughes, 640 F.3d 428, 439-40 (1st Cir. 2011), and cases cited.[5] LeBeau has failed to establish grounds for habeas relief based on his waiver of his Miranda rights.

---

[5] The instant case differs significantly from Commonwealth v. Magee, 423 Mass. 381, 668 N.E.2d 339 (1996), on which LeBeau relies. In Magee, the defendant was questioned for seven hours about the death of her infant, questioning continued despite her refusal to answer, when she indicated an interest in obtaining a lawyer she was not assisted by the police, and the defendant was "emotionally distraught throughout the entire interrogation period, with a number of episodes of forceful crying and uncontrollable shaking." Id. at 387, 668 N.E.2d at 344. Moreover, the police used coercive tactics by promising that if she "would give them the information they wanted she would receive the psychological help she was seeking." Id. Here, LeBeau was not emotionally distraught, was not made any promises and was not denied access to an attorney, among many of the differences between the two cases.

## C.    The Failure to Exclude the Keno Tickets

LeBeau claims that trial counsel was ineffective because he failed to file a pre-trial motion to suppress the Keno tickets found in his wallet, although counsel did object at trial.  Moreover, LeBeau contends that his consent to search his wallet was not freely and voluntarily given.  Pet. Mem. at 27-31.  The SJC concluded that counsel was not ineffective for failing to file a pre-trial motion to suppress because the court was "confident" that any such motion would have been denied.  Lebeau, 451 Mass. at 259 n.15, 884 N.E.2d at 968-69 n.15.  Further, the court concluded that the objection to the introduction of the consent to search form was properly denied.  As an initial matter, the SJC found "[t]he defendant displayed an attitude of cooperation throughout the evening, at least until the time he was confronted with the stolen Keno tickets."  Id. at 259, 884 N.E.2d at 969.  Moreover, as the SJC explained,

> it is clear from the record that the defendant knew that he could
> refuse to consent: indeed, before he agreed to consent to the search,
> he consciously bargained with the officers for a promise that no
> negative consequences would befall him on the inevitable discovery
> of his stash of marijuana.  Presumably, the presence of the victim's
> Keno tickets in his wallet (which also would inevitably be discovered
> by police) had slipped the defendant's mind.

Id. at 259-60, 884 N.E.2d at 969 (footnote omitted).  The refusal to suppress the Keno tickets was neither contrary to nor an unreasonable application of Supreme Court decisions.

## 1.     The Alleged Fourth Amendment Violation

This court may not grant LeBeau habeas relief based on an unlawful search and seizure in violation of the Fourth Amendment.  "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search was introduced at his trial."  Stone v. Powell, 428 U.S. 465, 482, 96 S. Ct. 3037, 3046, 49 L. Ed. 2d 1067 (1976).  Unless LeBeau can show that he "had no realistic opportunity to litigate his Fourth Amendment claim fully and fairly in the state system," this court cannot revisit the state court's disposition of the issue.  Dipaolo, 265 F.3d at 8.

In the instant case, although LeBeau's counsel did not file a pre-trial motion to suppress, the trial judge did confront whether the search was legal in ruling on counsel's objection to the introduction of the Keno tickets.  LeBeau, 451 Mass. at 258, 884 N.E.2d at 968.  Moreover, the SJC reviewed LeBeau's objection to the introduction of the tickets "under the statutory standard set forth in G.L. c. 278, § 33E, that is, whether there was error during trial (by defense counsel, the prosecutor, or the judge) and, if so, whether the error could have resulted in a substantial likelihood of a miscarriage of justice."  Id. at 258-59, 884 N.E.2d at 968.  Thus, LeBeau did have an opportunity to fully and fairly litigate his claim that the search of his wallet violated his constitutional rights.  While LeBeau may not agree with the SJC's conclusion that there was no error in admitting the tickets, an erroneous ruling "standing alone, cannot be treated as a denial of the

opportunity fully and fairly to litigate a Fourth Amendment claim."  Dipaolo, 265 F.3d at

9.  LeBeau has not stated a claim for habeas relief based on an allegedly unlawful search

of his wallet.

## 2.    The Ineffective Assistance of Counsel Claim

Similarly, LeBeau's claim that the SJC erred in failing to find that his counsel was

ineffective due to his failure to file a pre-trial motion to suppress fails to state a claim for

habeas relief as the SJC decision was not contrary to or an unreasonable application of

Supreme Court law.  First, the record is clear that the SJC applied the appropriate

standard.  Second, the SJC's decision was not unreasonable.

To succeed on a claim of ineffective assistance of counsel, a defendant must show:

(1) deficiency – "that counsel made errors so serious that counsel was not functioning as

the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) prejudice – "that

there is a reasonable probability that, but for the counsel's professional errors, the result of

the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 687,

694, 104 S. Ct. 2052, 2064, 2068 (1984).  "A defendant's failure to satisfy one prong of

the Strickland analysis obviates the need for a court to consider the remaining prong."

Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (citing Strickland, 466 U.S. at 697, 104

S. Ct. 2052).  Where, as here, the SJC applied a "substantial likelihood of a miscarriage of

justice standard, its decision will not be deemed to be 'contrary to' the Strickland

criterion" since it is at least as favorable to the defendant as the federal standard.  Knight,

447 F.3d at 15 (citation omitted).

The SJC also properly ruled that if LeBeau's consent to the search was voluntary, there was no ineffective assistance of counsel for failure to file a futile motion to suppress. See Knight, 447 F.3d at 16 ("[C]ounsel could not have rendered ineffective assistance in failing to object to alleged errors of state evidentiary law that were either non-prejudicial or nonexistent."); Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999) ("Obviously, counsel's performance was not deficient if he declined to pursue a futile tactic.") Thus, the SJC applied the appropriate standards.

A review of the record also compels the conclusion that the SJC's decision that LeBeau voluntarily consented to the search of his wallet was not an unreasonable application of Supreme Court law. The voluntariness of a consent to search depends on the totality of the circumstances. United States v. Drayton, 536 U.S. 194, 201, 122 S. Ct. 2105, 2111, 153 L. Ed. 2d 242 (2002). There is nothing inappropriate in law enforcement personnel requesting consent to search, "provided they do not induce cooperation by coercive means." Id., 122 S. Ct. at 2110. Here, the police did nothing more than ask LeBeau to consent, and they were not obligated to expressly inform him of his right to refuse to consent. See id. at 206-07, 122 S. Ct. at 2113; Schneckloth v. Bustamonte, 412 U.S. 218, 248-49, 93 S. Ct. 2041, 2059, 36 L. Ed. 2d 854 (1973). In any event, the SJC's finding that he clearly understood that he had a right to refuse to consent if he so chose is amply supported by the record. Finally, the fact that LeBeau gave consent to search while in a police station does not render the consent involuntary, especially where, as here, he freely accompanied the police to the station. See U.S. v. Mendenhall, 446 U.S. 544, 559,

100 S. Ct. 1870, 1880, 64 L. Ed. 2d 497 (1980).  Given all these facts, the state courts'

conclusion that LeBeau voluntarily consented to the search of his wallet did not involve an

unreasonable application of Supreme Court law.

### D.   Evidentiary Challenges

LeBeau challenges various evidentiary rulings by the trial judge on the grounds that

the evidence was "irrelevant and highly prejudicial" and that its admission "undermined

the integrity of the verdicts."  LeBeau, 451 Mass. at 260-61, 884 N.E.2d at 969-70.  The

SJC reviewed all of the claims of error, as well as the limiting instructions given by the

trial judge and concluded that the judge's rulings were not in error.  Id.  LeBeau's

challenge to this conclusion does not state a basis for habeas relief.

It is well established that "[e]rrors based on violations of state law are not within

the reach of federal habeas petitions unless there is a federal constitutional claim raised."

Kater, 459 F.3d at 61.  Such a case would be "very rare" and would have to involve

"extreme facts."  Id. at 61, 64.  Here, LeBeau himself does not allege any constitutional

violations in connection with this evidence.  See Pet. Mem. at 31-36.  Moreover, as the

SJC concluded, "in light of the compelling nature of the Commonwealth's admissible

evidence, any error in the admission of the testimony could not have created a substantial

likelihood of a miscarriage of justice."  LeBeau, 451 Mass. at 261 n.18, 884 N.E.2d at 970

n.18.  This case falls into the general class of cases where "[h]abeas relief is unavailable to

persons solely on the basis of alleged errors in evidentiary rulings."  Salemme v. Ristaino,

587 F.2d 81, 85 (1st Cir. 1978). LeBeau has failed to assert a basis for habeas relief based on the evidentiary rulings.

###    E.    Failure to Reduce the Verdict to Manslaughter

LeBeau's final contention that the SJC erroneously failed to reduce his first degree murder verdict to manslaughter also must fail because the error, if any, is based in state law. Thus, LeBeau's challenge to the SJC's refusal to exercise its discretion, pursuant to Mass. Gen. Laws ch. 278, § 33E, to reduce LeBeau's first-degree murder verdict raises only an issue of state law. It does not provide grounds for habeas relief. See McAfee v. Roden, No. 09-10935-JLT, 2010 WL 3259145, slip op. at *10 (D. Mass. May 18, 2010) (petitioner's challenge to SJC's determination under Mass. Gen. Law ch. 278, § 33E, is not reviewable on a federal habeas petition) (citing Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991)); accord Robinson v. St. Amand, No. 08-11535-RGS, 2010 WL 1257978, at *11 (D. Mass. Mar. 15, 2010) ("[T]he SJC's refusal to exercise its 'extraordinary power' under Mass. Gen. Laws ch. 278, § 33E does not state a habeas claim.").

## IV.    CONCLUSION

For all the reasons detailed herein, this Court recommends to the District Judge to whom this case is assigned that LeBeau's Petition for a Writ of Habeas Corpus be DENIED.[6]

_____

[6] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto

_/ s /_ Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge

with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommenda-tion.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).